## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA
## TULSA DIVISION

| | | |
|---|---|---|
| 1.   ALERT 360 OPCO, INC.; | ) | |
| | ) | |
| 2.   CENTRAL SECURITY GROUP – NATIONWIDE, INC. D/B/A ALERT 360; AND | ) ) ) | |
| | ) | |
| 3.   GUARDIAN SECURITY SYSTEMS, INC., D/B/A ALERT 360 | ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.:  23-cv-00082-JFH-CDL |
| 1. VIVINT SMART HOME, INC. F/K/A MOSAIC ACQUISITION CORP.; AND | ) ) | |
| | ) | |
| 2. LEGACY VIVINT SMART HOME, INC. F/K/A VIVINT SMART HOME, INC, | ) ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Alert 360 Opco, Inc., Central Security Group – Nationwide, Inc. d/b/a Alert 360, and Guardian Security Systems, Inc. d/b/a Alert 360 (collectively "Alert 360"), bring this action for damages, punitive damages, attorneys' fees, and costs against Defendants Vivint Smart Home, Inc. f/k/a Mosaic Acquisition Corp. and Legacy Vivint Smart Home, Inc. f/k/a Vivint Smart Home Inc. (together "Vivint"), and in support allege as follows:

## SUMMARY OF THE CASE

1.      This case is about Vivint's false and misleading sales practices on the doorsteps and in the homes of hundreds—if not thousands—of Alert 360 customers across the country. Through well-rehearsed sales tactics, Vivint's sales representatives have misled scores of Alert 360 customers into believing, among other things: (1) that Alert 360 has gone out of business; (2)

that Alert 360 is in bankruptcy; (3) that Vivint is the manufacturer of Alert 360's equipment; (4) that Alert 360 changed its named to Vivint; (5) that Vivint has come to upgrade Alert 360 customers' alarm keypads; and (6) that Vivint purchased Alert 360, so the alarm signals will no longer go to the police if the customer does not replace the equipment.   These affiliation misrepresentations allow Vivint to freeride on the goodwill of Alert 360, damage Alert 360's name, and lead Alert 360's customers to do business with Vivint under false pretenses, typically resulting in the Alert 360 customer becoming bound into a multi-year contract with Vivint, valued in the thousands of dollars, that is impossible for the customer to extricate himself or herself from once the customer has finally become aware of Vivint's deception.   These practices violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and constitute common law trademark infringement, common law unfair competition, tortious interference with a contract, and a violation of the Oklahoma Deceptive Trade Practices Act. Alert 360 seeks damages to remedy its loss of numerous customers (some known, some unknown) and the disruption of thousands of others since February 24, 2020; Alert 360's injuries to its goodwill and reputation, including the significant money and resources Alert 360 expends to remedy or counter Vivint's deceptive conduct; Alert 360's lost royalties from Vivint's unauthorized use of the Alert 360 brand; Vivint's profits from its ill-gotten gains, Alert 360's attorneys' fees; and punitive damages to punish and deter Vivint from continuing to engage in its intentional conduct.

## **PARTIES**

2.     Plaintiff Alert 360 Opco, Inc. is a Delaware corporation with its principal place of business at 2448 E. 81st Street, Suite 4300, Tulsa, Oklahoma 74137.   Alert 360 Opco, Inc. is the parent company for Central Security Group – Nationwide, Inc. d/b/a Alert 360, a Delaware corporation with its principal place of business at 2448 E. 81st Street, Suite 4300, Tulsa, Oklahoma

74137. Guardian Security Systems, Inc. dba Alert 360, is an Oklahoma Corporation with its principal place of business also at 2448 E. 81st Street. Suite 4300, Tulsa, Oklahoma 74137.

3.      Alert 360 is a leader in customized security and home automation solutions for more than 50 years. It is the fifth largest provider of monitored security and smart home solutions to homes in the United States, and maintains offices in Oklahoma, California, Texas, Kansas, Arizona, and Florida, providing services to customers in over 20 states.

4.      Defendant Vivint Smart Home, Inc., formerly known as Mosaic Acquisition Corp., is a Delaware corporation with its principal place of business located at 4931 North 300 West, Provo, Utah 84604. Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.) was created on January 17, 2020 pursuant to an Agreement and Plan of Merger, dated September 15, 2019, by and among Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.), Maiden Merger Sub, Inc., and Legacy Vivint Smart Home, Inc. (f/k/a Vivint Smart Home, Inc.). Vivint Smart Home, Inc.'s (f/k/a Mosaic Acquisition Corp.) registered agent for service of process is The Corporate Trust Company, Corporation Trust Center 2109 Orange Street, Wilmington, Delaware, 19801.

5.      Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.) is listed on the New York Stock exchange and currently has a market capitalization of $2.4 billion.

6.      On information and belief, following the January 17, 2020 merger, Defendant Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.) has assumed liability or is otherwise liable as a successor for the tortious conduct committed by Legacy Vivint Smart Home, Inc. (formerly known as Vivint Smart Home, Inc.) and/or its employees prior to the merger.

7.      On information and belief, following the January 17, 2020 merger, employees of Legacy Vivint Smart Home, Inc. (formerly known as Vivint Smart Home, Inc.) became employees of Vivint Smart Home, Inc. (formerly known as Mosaic Acquisition Corp.).

8.      Defendant Legacy Vivint Smart Home, Inc., formerly known as Vivint Smart Home, Inc., is a Delaware corporation with its principal place of business located at 4931 North 300 West, Provo Utah 84604. On January 17, 2020 pursuant to an Agreement and Plan of Merger dated September 15, 2019, Legacy Vivint Smart Home Inc. (f/k/a Vivint Smart Home, Inc.) merged into Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.). Upon information and belief, until the January 17, 2020 merger with Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.), Legacy Vivint Smart Home, Inc. (f/k/a Vivint Smart Home, Inc.) employed the Vivint sales persons who generated and sold new accounts on behalf of Vivint. The registered agent for service of process for Legacy Vivint Smart Home, Inc. f/k/a Vivint Smart Home, Inc.) is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Section 1331 of Title 28 because it presents a federal question under Section 43 of the Lanham Act.

10.     This Court has supplemental jurisdiction over the state law claims also asserted in this action pursuant to Section 1367(a) of Title 28.

11.     This Court also has jurisdiction over this action pursuant to Section 1332 of Title 28 because the parties are completely diverse, and the amount in controversy exceeds $75,000.

12.     Venue lies in this District pursuant to Section 1391(b) of Title 28 because a substantial number of the events giving rise to the claims asserted in this Complaint occurred in this District and because Vivint is subject to the Court's personal jurisdiction in this District for committing tortious conduct purposefully directed at this District as described herein.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### ALERT 360 AND VIVINT COMPETE IN THE HOME SECURITY SYSTEM, AUTOMATION, AND SMART HOME MARKETS

13.     Alert 360, founded in 1973, is Oklahoma's oldest-licensed provider of home security and smart home solutions.  Today, Alert 360 is the 5th largest security company for residential customers in the United States.

14.     Alert 360 provides security, automation, and smart-home services and equipment nationwide and is engaged in interstate commerce for the purposes of the Lanham Act.

15.     Alert 360's name and trademarks are registered with the United States Patent and Trademark Office.

16.     Plaintiff Alert 360 Opco, Inc. is the parent company to the other two Plaintiffs in this lawsuit (Central Security Group – Nationwide Inc., d/b/a Alert 360, and Guardian Security Systems, Inc. d/b/a Alert 360) and owns the Alert 360 name and trademarks registered in the United States Patent & Trademark Office that bear the registration numbers 87925660 and 623803 and applications that bear the application numbers 90/361744 and 87/925660.

17.     Plaintiff Central Security Group – Nationwide, Inc. d/b/a Alert 360 and Plaintiff Guardian Security Systems, Inc. d/b/a Alert 360 are operating companies that run the Alert 360 alarm services business in the United States.  These two companies, as wholly-owned subsidiaries of Alert 360 Opco, Inc. and utilize the Alert 360 name and trademarks owned by Alert 360 Opco, Inc.

18.     Alert 360 maintains branch offices throughout Oklahoma, is registered to do business in Oklahoma, and is an Oklahoma resident. Alert 360 is injured in Oklahoma by Vivint's tortious activities.

19.     Vivint began selling and installing alarm systems under the name APX Alarm Security Solutions in 1999. APX rebranded itself as "Vivint" in 2011.

20.     Today, Vivint operates in most states, including Oklahoma. Vivint is registered to do business in Oklahoma with the Oklahoma Secretary of State.  A substantial portion of the violations that form the basis of this complaint occurred in Oklahoma.  At all times relevant to this Complaint, Vivint misled Oklahoma consumers and engaged in the deceptive sales practices that are the subject of this civil action.

21.     Vivint and Alert 360 are direct competitors in the security systems, automation and smart home markets. Alert 360 and Vivint market and sell substantially similar goods made by the same suppliers through the same channels to the same target markets of residential consumers. The companies also provide substantially similar security monitoring services to their respective customers. Alert 360 operates in each of the states in which Vivint sells and installs alarm systems.

### VIVINT'S DECEPTIVE SALES PRACTICES

22.     Vivint's sales representatives target Alert 360 customers in various ways, often by seeking houses with the distinctive Alert 360 yard sign and/or window stickers that Alert 360 customers post on their premises to deter burglars and trespassers.  In addition, these yard signs and window stickers communicate to competitors, such as Vivint, that the homeowner has an existing business relationship with Alert 360.

23.     Vivint's sales representatives engage Alert 360's customers in unannounced "cold" door-to-door sales visits to the customers' homes.  At the beginning of these visits, and often throughout the sales encounter, the representatives use deceptive sales pitches that are intended to mislead (and that do mislead) Alert 360's customers into believing that (1) that Alert 360 has gone out of business; (2) that Alert 360 is in bankruptcy; (3) that Vivint is the manufacturer of Alert

360's equipment; (4) that Alert 360 changed its name to Vivint; (5) that Vivint has come to upgrade Alert 360 customers' alarm keypads; or (6) that Vivint purchased Alert 360, so the alarm signals will no longer go to the police if the customer does not replace the equipment..

24.     Despite knowing that these statements are false, Vivint's sales representatives use these pitches to induce Alert 360 customers to believe that they have an existing business relationship with the Vivint sales representatives and to gain entry into the customers' homes. Once inside, having won the customers' trust by this deception, the representatives have customers sign Vivint contracts and install Vivint alarm systems in the often mistaken belief that they are receiving new Alert 360 equipment from Alert 360, an Alert 360 affiliate, or an Alert 360 successor, that Vivint is assuming the customer's Alert 360 account, or that the customer has no choice but to permit the transaction to go forward if he or she wishes to continue to have operational alarm-monitoring services.

25.     In reality, neither Vivint nor their sales representatives are affiliated with Alert 360 in any way, nor has Vivint legitimately assumed any Alert 360 customer accounts or succeeded Alert 360 in the home security monitoring market.  Accordingly, the statements made by Vivint's respective sales representatives in order to gain entry into the homes of Alert 360's customers and convince them to allow the sales representative to replace Alert 360 equipment and/or the underlying alarm monitoring services are false and misleading.

26.     Having heard Vivint's untrue claims of affiliation with Alert 360, Alert 360's customers allow these sales representatives into their homes in the mistaken belief that they are speaking with a person somehow affiliated with Alert 360, visiting to provide the customers with goods and services that are related to their existing Alert 360 alarm system.  Alert 360's customers repeatedly confirm that but for this initial confusion, they would never have allowed Vivint's sales

representatives into their homes or to otherwise inspect, manipulate, or replace the equipment previously installed by Alert 360.

27.     The alarm monitoring services provided by Alert 360, and subscribed to by Alert 360's customers, require the use of equipment compatible with Alert 360's services.  Accordingly, once Vivint removes Alert 360's equipment from customer homes, Alert 360 is typically no longer able to provide the services for which its customers have contracted.

28.     As a result, a number of Alert 360 customers have unwittingly found themselves with Vivint's alarm systems installed in their homes, and with simultaneous contractual obligations to both Alert 360 and Vivint, who deceived them into entering into a contract under false pretenses.

29.     In other instances, the customers retained Vivint's systems and terminated their Alert 360 contracts because Vivint makes it too difficult and time-consuming for the customer to end Vivint's service, even though the contracts were entered into because of Vivint's deceptive practices. In some circumstances, Vivint will require it's dishonestly obtained customers to pay substantial contract-termination fees without consideration that the customer's contract was acquired through false and deceptive means.

### COMPLAINTS BY ALERT 360 CUSTOMERS

30.     Alert 360 has received, and continues to receive, reports of deceptive sales encounters by Vivint sales representatives from Alert 360 customers in Oklahoma, and across the United States.  As explained in the next section, these complaints represent a small fraction of Vivint's actual malfeasance against Alert 360 customers. Upon information and belief, internal Vivint documents will reveal the true scale of Vivint's wrongdoing against Alert 360 customers.

31.     To date, Alert 360 has received over one hundred complaints from its customers about Vivint's deceptive sales practices. Alert 360 anticipates by the time of trial, the volume of

Alert 360 consumers complaining about Vivint's deceptive sales practices will be even more numerous.

32.     Vivint's deceptive sales practices and claims of affiliation with Alert 360 are commonplace in their interactions with Alert 360 customers.  And as a result, Alert 360 is left to spend its own capital correcting and otherwise repairing the damage done by Vivint's conduct.

33.     The complaints Alert 360 receives from its customers are disturbing. In addition to nearly every interaction between Vivint and Alert 360 customers involving deception, Vivint's sales tactics are often accompanied by other reprehensible conduct, like Vivint representatives targeting the elderly, employing aggressive methods to enter the customer's home without permission, and even hurling insults and degrading comments to individuals that refuse their sales pitch.

34.     The deceptive, harassing, and unfair methods employed by Vivint are regular and systematic. Despite numerous lawsuits by state attorneys general, the United States Department of Justice, and private actors, Vivint's conduct continues to plague communities across the United States.

35.     Vivint targets Alert 360 customers in Oklahoma and every other state in which Alert 360 does business. Alert 360 is aware of more than 600 of its customers that Vivint has targeted with its deceptive sales practices in Oklahoma alone. Moreover, based upon a consumer complaint multiplier that Vivint has adopted internally and in public court filings, Alert 360 estimates that the number of Alert 360 customers in Oklahoma who have been subject to Vivint's deceptive practices is upwards of 12,000.

*Complaints Related to Vivint's Targeting of Elderly Alert 360 Customers*

36.     In one reported encounter, Vivint preyed upon P. Potersnak, an elderly Alert 360 customer. Ms. Potersnak received a knock on her door from a Vivint representative on or about the evening of September 17, 2020. Upon Ms. Potersnak answering, the Vivint representative broke into the deceptive sales pitch typical of Vivint's interactions with the elderly.  First, the Vivint representative falsely represented to Ms. Potersnak that her current home security provider (Alert 360) was going out of business and Vivint had acquired her account.   The sales representative even showed a letter to Ms. Potersnak, on Alert 360 letterhead, to convince her Alert 360 had gone out of business.  After gaining Ms. Potersnak's trust, the Vivint representative deceived her again to gain access to her home, telling her that he would need to install and update her system or she would go without home security.   Once inside her home, the Vivint representative worked quickly to replace Ms. Potersnak's existing system with a Vivint system. Ms. Potersnak's neighbor became concerned for the elderly woman and called Alert 360 for help. When the Alert 360 dispatcher arrived twelve minutes later, the Vivint representative was gone and Ms. Potersnak was in tears, complaining that she had not worked hard "all my life to have an alarm company scam me."  The Alert 360 dispatcher had to reinstall the Alert 360 key pad so that Ms. Potersnak could continue to receive alarm monitoring from Alert 360.

37.     In another encounter on or about June 12, 2020, Vivint representatives targeted 85-year-old M. Nichols at her home. Ms. Nichols had been an Alert 360 customer for over a decade. The Vivint representative attempted to deceive Ms. Nichols to gain access into her home, stating, "he was with Vivint and Alert 360 is Vivint."

38.     On or about July 16, 2020, a Vivint representative "bragged" to Alert 360 customer M. Royals that "he got an 80 year old lady that lived behind [her] to sign up."  The representative

lied to Ms. Royals, telling her that he was a distributor of equipment and needed to update the alarm system in her home.

39.     On September 12, 2020, a Vivint sales representative visited the home of Alert 360 customer R. Rose. Mr. Rose is a 90-year old man suffering from dementia.  A Vivint sales representative falsely represented himself to be an Alert 360 employee and told Mr. Rose that he needed to upgrade the alarm system.   The Vivint sales representative removed Alert 360's equipment and installed a new system. Mr. Rose's daughter contacted Alert 360, who sent a technician to Mr. Rose's home reinstall Alert 360's equipment.

40.     As the examples above show, Vivint systematically targets the elderly.   The practice has become so notorious that the loved ones of Vivint's elderly targets take measures guard against the fraud.  M. Lincoln, an elderly woman, was lucky that her grandson was privy to Vivint's predatory conduct.  On or about August 15, 2020, Ms. Lincoln's grandson answered her front door to a Vivint scammer, who tried to deceive him by stating his grandmother's system needed an update or else it would stop working.  But Ms. Lincoln's grandson knew of Vivint's scams, and after telling the Vivint representative to leave, he reported the incident "to make sure his grandmother is safe."

### Complaints Related to Vivint's Aggressive, Deceptive, and Predatory Sales Tactics

41.     Other examples highlight the aggressive nature of Vivint's deceptive and predatory sales tactics.  On or about June 12, 2020, Alert 360 customer M. Kearney experienced those tactics first-hand when she nearly fell victim to a Vivint representative's scam.   A male Vivint representative showed up to Ms. Kearney's home one afternoon to deliver his pitch. Ms. Kearney described the representative as "very pushy" and stated that "she told him to leave several times." After Ms. Kearney finally persuaded the Vivint representative to leave, on his way out, he began

"trying to remove her [Alert 360] yard sign" until Ms. Kearney "began yelling at him to leave it alone and to leave her property." It is no surprise Ms. Kearney was very upset following the ordeal.

42.    On or about July 15, 2020, Alert 360 customer A. Lee reported a Vivint representative "got very aggressive" with her when she told him to leave. The Vivint representative continued to ask for entry into her house and "became very pushy with her" despite her repeated instructions for them to leave.

43.    On or about July 16, 2020, Alert 360 customer S. Giarde was targeted due to the Alert 360 sticker on her door. When a Vivint representative paid her a visit, he falsely represented that he was from Ms. Giarde's alarm company (Alert 360) and needed to talk. When Ms. Giarde outright refused, the Vivint representative "made a derogatory comment to her while she was shutting the door."

*Complaints from Alert 360 Customers after Receiving Bills from Vivint*

44.    On or about July 2, 2020, Vivint representatives told B. Decarlo that Alert 360 had gone out of business and her system needed to be updated. Ms. Decarlo was surprised when her bank statements revealed a $2000 surprise bill from Vivint and a new Vivint contract, and she only discovered Alert 360 was still operating after she called Alert 360 upon discovering the Vivint bill.

45.    It is often the case, as it was for elderly Alert 360 customer S. Nua, who was deceived by Vivint on or about April 12, 2020, that cancelling a fraudulently entered Vivint contract (after bank billing statements reveal a successful scam by Vivint's representatives) imposes too great a burden. In such cases, as illustrated by Ms. Nua's experience, Alert 360 loses current and future revenue.

*Complaints Related to Vivint's Threatening Tactics and Local Law Enforcement Involvement*

46.     The threatening nature of Vivint's sales tactics has prompted many Alert 360 customers to call local police departments for help.  Alert 360 customer M. Ballard did just that during her September 26, 2020 encounter with a Vivint representative at her home. After receiving a knock on her door, the Vivint representative "started off telling her that Vivint and Brinks were with Alert 360" and "they sent him to change out the keypad due to the one she has will catch on fire." Ms. Ballard was not deceived, and the Vivint representative became "distraught" and refused to leave when Ms. Ballard called his bluff.   The Vivint representative finally left when she began calling the police. Ms. Ballard was so shaken from her interaction with Vivint that she added a duress password to her Alert 360 alarm system and made a full incident report to her local police department.

*Complaints Related to Vivint Salespersons Lying about an Affiliation with Alert 360*

47.     Alert 360 customers commonly report Vivint sales persons lying about an affiliation with Alert 360.

48.     In June 2020, Ian Neil, a Vivint sales representative, came to the home of Alert 360 customer J. Walker and claimed that Vivint had bought Alert 360. Neil told Mr. Walker he needed to change out the control panel because the existing ones were sparking and causing fires.  At this representation, Mr. Walker let Neil into his home to inspect the keypad. Neil then sent a technician and installed new keypads.

49.     A similar occurrence happened to Alert 360 customer J. Holt in June 2020 at his home.  Again, a Vivint sales representative, Bret Mannlein, informed Mr. Holt that his equipment could catch fire and it needed to be replaced immediately to continue working.  Vivint installed new equipment and had Mr. Holt sign a contract that day. Mr. Holt contacted Alert 360 when he discovered he was scammed by Vivint and wanted help canceling the contract he had signed with

Vivint.

50.     In July 2020, a Vivint sales representative came to the home of Alert 360 customer M. White.  The man claimed his company had bought out Alert 360 and had Ms. White sign paperwork for a new system.  Ms. White called Alert 360 and was informed the sales representative had lied to her, but she had already sign a contract.

51.     On or about July 27, 2020, Alert 360 customer N. Henson was approached by a Vivint representative that stated his company had merged with Alert 360 and changed its name to Alert 360 and Vivint.  He then stated he needed to change Mr. Henson's alarm system to upgrade his cameras and hardware.

52.     On or around August 2020, a Vivint sales representative approached Alert 360 customer M. Beal at her home.  The sales representative informed Ms. Beal and her daughter, D. Patrick, that he was Brinks Security System and that Brinks had bought out Alert 360.  The sales representative, Matthew, said he needed to replace a chip in the doorbell camera and started going over contract information with her. Ms. Patrick noted that the contract, provided by the Vivint sales representative, already had most of Ms. Beal's information, including Ms. Beal's signature from her Alert 360 contract.

53.     On or about August 4, 2020, a Vivint sales representative approached Alert 360 customer R. Riley and told Mr. Riley his alarm system was under recall.  The Vivint sales representative began cutting wires and disconnected the alarm keypad.

54.     On or about October 11, 2020, Alert 360 customer R. Hopkins was approached by a Vivint representative, who claimed he was there to update his current Alert 360 system, stating he had authorization from the company to perform the update.

55.     On or about October 9, 2020, Alert 360 customer P. Laberge was approached by a

Vivint representative, who represented that the wiring of his existing Alert 360 was bad, and he needed to check inside his home to see if an update was necessary.

56.     On or about January 4, 2021, Alert 360 customer K. Maloney had a Vivint representative show up to her door, stating he was there to upgrade her existing Alert 360 equipment.

57.     In May 2022, Alert 360 customer Brown had a Vivint representative come to her house more than once advising of a 4G upgrade and telling her that her system would be shut off, that Vivint manufactured the system, that Vivint worked with Alert360, and that her system needed to be upgraded.

58.     In May 2022, Alert 360 customer Rhodes had a Vivint representative come to her door and tell her that Alert 360 had been sold to Vivint, that Alert 360 was no longer in business, and that Ms. Rhodes needed to upgrade her system.

59.     In May 2022, Alert 360 customer Annie had a Vivint representative come to her door wearing a Vivint shirt and advise her that he was from Alert 360 and that Annie needed to have a new system installed because her current system would be easy for robbers to deactivate.

60.     In June 2022, Alert 360 customer Ison had two Vivint representatives come to her door while her daughter was home alone.  The Vivint representatives said they were there to replace the keypad because Alert 360 had sent them due to Vivint buying out her Alert 360 contract.  The Vivint representatives further contended that due to Vivint's buyout of her contract, the alarm system was no longer sending signals to the police.

61.     In June 2022, Alert 360 customer E. Jones had two Vivint representatives visit his home contending that Vivint had bought out Alert 360 and, therefore, Vivint needed to change the alarm panel.

62.     In June 2022, Alert 360 customer C. Parks had a Vivint sales representative visit her home and tell her Vivint was the manufacturer of her Alert 360 equipment in an attempt to get into her home.

63.     In June 2022, Alert 360 customer Davis had Vivint sales representative, Tristan Saint Fleur, visit his home and tell him that Alert 360 was bankrupt and out of business .  The Vivint sales representative also removed Mr. Davis's equipment from his home.  This deceptive interaction occurred while Mr. Davis was recovering from surgery and on strong pain medication.

64.     In June 2022, Alert 360 customer J. Walker had a Vivint representative visit his home, tell him Alert 360 was bankrupt and going out of business, take out his Alert 360 system, and begin installing a Vivint system.  Shortly thereafter, Mr. Walker became aware that his neighbor had also fallen victim to Vivint's deceptive tactics.

65.     In June 2022, Alert 360 customer Moore had a Vivint representative visit his home and tell him he was there to update Mr. Moore's alarm keypad.

66.     In July 2022, Alert 360 customer Vine had Vivint sales representative Tristan Saint Fleur visit his home contending that Alert 360 had sent him to change Ms. Vine's keypad due to a 5G upgrade.

67.     In July 2022, Alert 360 customer Aguilar had a Vivint representative visit her home, tell her he was with Alert 360, tell her he was there to upgrade her system, and tell her he would give her a new camera.  When Ms. Aguilar asked the Vivint representative if he was with Alert 360, he changed his story and said that Vivint would be buying out her Alert 360 contract.

68.     Vivint's deceptive sales practices and claims of affiliation with Alert 360 (in addition to the other reprehensible conduct) highlighted here are typical of the hundreds of complaints Alert 360 has received from its customers about Vivint. Because Vivint shows no signs

of ceasing its unlawful conduct, Alert 360's investigation into Vivint's deceptive sales practices, loss of revenue from Vivint's deceiving their customers, and costs associated with remediating specific instances of Vivint's wrongdoing, remain ongoing.

### THE REPORTED NUMBER OF VIVINT'S DECEPTIVE SALES PRACTICES IS THE TIP OF THE ICEBERG

69.     The Alert 360 customer complaints cited above are but a small sample of a much larger population of the hundreds of reported instances of misconduct by Vivint's sales representatives, which have continued unabated.  The population of reported instances is, in turn, but a small fraction of the likely number of occurrences in the market.  It is an accepted and obvious tenet of consumer complaint behavior that for every aggrieved customer who reports a deceptive sales practice, many more go uncounted; Vivint has admitted that this is true.

70.     Vivint recognizes that the number of *reported* incidents about Vivint's deceptive sales practices is only the tip of the iceberg.  For every reported incident, there are many more that go unreported—even if the customer ultimately cancels Alert 360's services or becomes so frustrated with Alert 360 because of Vivint's practices that the customer stops paying for any alarm system. Indeed, in a past Lanham Act action Vivint brought against another competitor in the alarm industry, Vivint represented to the District of Utah that only 4% of deceived customers take the time to complain. According to Vivint, this fact is so uncontroversial that it is capable of judicial notice.

[1] It is commonly accepted and the Court may take Judicial Notice of the fact that only a limited number of affected customers, roughly 4%, actually will take the time to complain. *See* Sheila Kessler, *Measuring and Managing Customer Satisfaction*, American Society for Quality 63-64 (1996). Therefore, the customers who have complained to Vivint about Defendants' unlawful activities likely represent only a fraction of the Vivint customers who have fallen victim to Defendants' improper conduct. More problematic, it is those who do not complain, and thus remain unidentified, who are likely to have ended their relationship with Vivint. *See* Jerry Plymire, *Complaints as Opportunities*, Business Horizons (Mar.-Apr. 1991)
(available at http://findarticles.com/p/articles/mi_m1038/is_n2_v34/ai_10544096/) (last visited March 23, 2012) (explaining that only 4% of dissatisfied customers complain, but that 91% of dissatisfied customers will never return and each of these dissatisfied customers will likely also repeat their complaints to eight to ten of their friends). Defendants' campaign to smear Vivint's reputation and goodwill is pervasive and consistent—and can be presumed to reach far beyond those Vivint customers who have reached out to Vivint to complain.

71.    Vivint internal documents regarding consumer behavior confirm this "tip of the iceberg" concept, as depicted in the diagram below.



72.    Upon information and belief, Vivint's own internal records will show how widespread and pervasive its deceptive sales practices are.  Many Alert 360 customers subjected to Vivint's deceptive sales practices will never complain to Alert 360.  Rather, upon learning of the deceptive conduct Vivint subjected them to, they will complain to Vivint. Alert 360 would therefore not have records of such conduct.  Nevertheless, on information and belief, Vivint will have exclusive possession and control of such records demonstrating their respective deceptive sales tactics.

73.    As the example complaints illustrate, Vivint's sales representatives have tailored their sales pitches to confuse Alert 360's customers on their doorsteps. Vivint's representatives

make false representations of affiliation with Alert 360 to win the customers' interest and trust.

74.     Alert 360 customers allow Vivint's sales representatives into their homes in the mistaken belief that they are speaking with a person affiliated somehow with Alert 360, visiting to provide the customers with goods and services that are related to their existing Alert 360 alarm system. Alert 360's customers repeatedly confirm that but for this initial confusion, they would never have allowed Vivint's sales representatives into their homes.

75.     This confusion at the outset of a sale harms Alert 360 by allowing competitors like Vivint to freeride on Alert 360's goodwill to gain its customers' attention and trust.  Any efforts by Vivint to later clarify their lack of Alert 360 affiliation do not cure the confusion that has already occurred at the outset of the transaction, even in those instances where a customer understands by the point of sale that he or she is contracting with Vivint.  But in most instances, the customer signs a contract with Vivint in the mistaken belief that he or she is signing only a work authorization for the installation of Alert 360 equipment by Alert 360 or its affiliate.

76.     To be sure, Vivint's deceptive practices do not start and end with Alert 360 customers.  Vivint has a long history of committing these false affiliation misrepresentations to customers of competing alarm companies.  Despite recognizing the severe damage inflicted by these type of deceptive sales practices, Vivint only takes deceptive sales practices seriously when they impact Vivint customers. Vivint has established a "slam" department—the industry term for the type of deceptive sales practices and misrepresentations of affiliation at issue here—to investigate and prosecute incidents involving Vivint customers.  In fact, Vivint has filed dozens of separate lawsuits against competitors and competitors' sales representatives in the past several years premised on these exact same claims, yet refuses to correct its own longstanding history of unrelenting deceptive sales conduct.

77.     Vivint's long history of deceptive practices has resulted in multiple class-action lawsuits and government actions.  Over the past decade, actions have been brought in states including Oregon, Wisconsin, Arkansas, Wyoming, California, Ohio, Florida, Nebraska, Kansas, Pennsylvania, and Arizona.  To date, however, no punishment or financial consequence has been enough to stop Vivint from defrauding customers throughout the country.

### STATE ENFORCEMENT ACTIONS HAVE NOT QUELLED VIVINT'S UNLAWFUL CONDUCT

78.     The type of deceptive conduct alleged in the Complaint has been the subject of numerous prior public enforcement actions by various state and federal agencies.  To date, the staggering number of enforcement actions against Vivint has done nothing to deter their practices.

79.     Various state entities have filed complaints against Vivint for its deceptive sales practices, including the Tennessee Board for Licensing Alarm Contractors (2009), the Minnesota Commission of Labor and Industry (2011), and the South Carolina Department of Labor, Licensing, and Regulation (2012).

80.     Numerous state attorneys general have also pursued actions against Vivint.

81.     In or around 2010, the Oregon Attorney General filed a complaint against Vivint for its deceptive sales practices.  Vivint was required to pay a $60,000 fine and claimed it would make significant changes to its sales practices.

82.     The Arkansas Attorney General pursued complaints against Vivint in or around 2012, which resulted in a $125,000 consent judgment against Vivint, for its deceptive sales practices.  The fine did not work, and the Arkansas Attorney General again had to chastise Vivint for its deceptive sales practices in 2019

83.     In or around 2012, the Wisconsin Attorney General filed a complaint against Vivint.[1]

.  In the 13-Count Complaint, the Wisconsin Attorney General asserted claims against Vivint for fraudulent misrepresentation and violations of Wisconsin statutes and regulations.  Vivint settled with Wisconsin, agreed to pay a hefty fine for using misleading and deceptive sales practices with Wisconsin customers, and change its business practices.

84.     In 2013, after an investigation by the Kansas Attorney General's Consumer Protection Division, the Kansas Attorney General filed a complaint against Vivint for violation Kansas consumer protection laws for its use of deceptive sales practices. Vivint agreed to pay restitution, fines, and investigation costs as part of its settlement agreement.

85.     Also in 2013, the Ohio Attorney General filed an enforcement action against Vivint for its deceptive sales practices.

86.     The Nebraska Attorney General also filed an action against Vivint in 2013 for its deceptive sales practices.  The Nebraska Attorney General included the following deceptive sales practices: Vivint claimed it was affiliated with another company or agency when it was not; Vivint claimed it was upgrading an existing security system when it was not; and Vivint claimed that an existing security has either gone out of business or merged with another.  Vivint entered into a voluntary compliance agreement with Nebraska and agreed to stop making misrepresentations and/or false or misleading statements that had the tendency to or effect of deceiving or misleading customers.

---

[1] *See* Case No. 12-CX-39198, Wis. Cir. Ct., Sept. 7, 2012, https://www.doj.state.wi.us/sites/default/files/2012-news/summons-complaint-vivint-20120927.pdf

87.    In or around 2015, the Florida Attorney General filed a complaint against Vivint, noting that it began receiving complaints about Vivint's deceptive sales practices in 2011. (Case No. L15-3-1143).  Vivint signed an Assurance of Voluntary Compliance in the Florida action, and agreed to stop using deceptive sales practices, abide by the Florida Deceptive and Unfair Trade Practices Act, and pay a fine.[2]

88.    In or around 2015, the Missouri Attorney General also took action against Vivint and its deceptive sales practices, after receiving consumer complaints of Vivint's misrepresentations and aggressive sales tactics.  Vivint reached a settlement with Missouri and agreed to pay $15,000 in civil penalties, $50,000 in restitution to Missouri consumers, and reform its business practices to remove any deceptive sales practices.

89.    Less than a year after its settlement with the Missouri Attorney General, 24 consumers had filed additional complaints with the Missouri Attorney General's office and against Vivint in 2016, based on its deceptive sales practices.  Vivint violated the settlement terms and its agreement to reform its business practices.  Instead, Vivint continued its deceptive sales practices with Missouri consumers.

90.    In 2017, another wave of Attorneys General tried to curb Vivint's unlawful conduct.  For example, in January 2017, Vivint settled an enforcement proceeding with the Pennsylvania Attorney General, which found that Vivint's sales representatives had violated the state's consumer protection laws by falsely stating, in door-to-door solicitations, that they were affiliated with the consumers' existing security companies, that the consumers' existing security

---

[2]http://www.myfloridalegal.com/EC_Edoc.nsf/0/679BD97E96C1813385257EB8005B01DA/$file/Vivint+AVC.pdf

providers had gone out of business, that they were purchased or taken over by Vivint, and that the consumers' alarm systems needed to be updated.

91.     In or around 2017, the Texas Attorney General filed a complaint against Vivint, based on complaints against Vivint and its deceptive sales practices that the Attorney General began receiving in 2012.  Vivint reached a settlement with Texas for repeated violations of the Texas Deceptive Practices Act and agreed to $135,000 to the state.

92.     Also in 2017, the Wyoming Attorney General filed an enforcement action against Vivint for its unlawful door-to-door tactics, which included "making misleading statements, knocking on doors with 'no solicitation' signs, visiting homes outside of hourly restrictions set by Wyoming municipalities, refusing to leave homes after homeowners indicated they were not interested, and entering homes and garages without permission."[3]

93.     In 2022, the Arizona Attorney General filed an enforcement action against Vivint for making false representations to induce consumers to sign a contract with Vivint and for allegedly extending consumer contracts over the phone without the consumer's knowledge or consent.  Vivint agreed to a consent judgment, which required Vivint to pay $400,000.[4]  To date, at least sixteen state Attorneys General and/or state entities have—with little or no success—tried to police Vivint's unlawful conduct.  In response to many of these state enforcement actions, Vivint

---

[3] *See* Wyoming Attorney General Consumer Protection Unit, State of Wyoming Cases (2017), http://ag.wyo.gov/cpu/resolved-matters ("Vivint, Inc. and Smart Home Pros, Inc., f/k/a Arm Security, Inc. (Case No. 2012-10)").

[4] *See* Arizona Attorney General Press Release, *AG Brnovich Reaches $400,000 Consent Judgment with Home Security Company*, https://www.azag.gov/press-release/ag-brnovich-reaches-400000-consent-judgment-home-security-company#:~:text=Any%20consumers%20who%20believe%20they,in%20costs%20and%20attorney's%20fees.

agreed to abide by the state consumer protection laws as part of the agreed settlement or judgment. Vivint, however, has continued its deceptive and predatory tactics.

### THE DEPARTMENT OF JUSTICE SUES VIVINT FOR ITS DECEPTIVE SALES PRACTICES

94.     Vivint's deceptive sales practices are so persistent, pervasive, and widespread that federal actors became involved in 2021.

95.     In April 2021, the United States' Department of Justice ("DOJ") sued Vivint on behalf of the Federal Trade Commission ("FTC") for violating the Fair Credit Reporting Act, the FTC Act, and the Red Flags Rule. *United States v. Vivint Smart Home, Inc.*, Case No. 2:21-cv-00267-TS (D. Utah Apr. 29, 2021)[5].   The FTC complaint details the "Misconduct by Sales Representatives" and how "Vivint Knew About Sales Representatives' Misconduct and Allowed It to Continue." *Id.* at ¶¶ 13-23.  The FTC specifically noted how Vivint employees continue to "evade the meager preventative measures [Vivint] attempted to implement," that Vivint is "aware of" the unlawful conduct of their representatives, and how Vivint "allowed the practices to continue." *Id.* at ¶ 21.

96.     The complaint alleged that Vivint knowingly allowed its sales representatives to obtain credit reports of unsuspecting customers, without their knowledge or consent.  Vivint also knowingly allowed its sales representatives to sell false debt to buyers and/or debt collectors.

97.     Vivint knowingly allowed its sales representatives to use the names and identities of innocent consumers, to complete sales to potential Vivint customers who did not pass the required credit checks.  When those Vivint customers later defaulted on their bills, Vivint sold the false debt to third party debt collectors, who in turn attempted to collect the debt from the victims,

---

[5]https://www.ftc.gov/system/files/documents/cases/de2_complaint_against_vivint_smart_home.pdf

who had no idea that Vivint had created accounts using their identities.

98.     Vivint settled the action with the DOJ and FTC, agreeing to pay $20 million to resolve the alleged violations of the FTC Act, FCRA, and the Red Flags Rule.  The settlement includes $15 million in civil penalties and $5 million in equitable monetary relief. This represents the largest civil penalty ever paid to resolve FCRA violations under the FTC Act.

99.     If the past decade of enforcement actions is any indication, it is clear that Vivint will continue its unlawful conduct regardless of the involvement of federal regulators.

100.    Based on Vivint's continued and persistent deceptive sales practices and conduct, despite the state and federal enforcement actions, Vivint considers regulatory actions and  penalties as "the cost of doing business."  The true cost of Vivint's predatory conduct, however, is felt by the individual victims of Vivint's fraud, including Alert 360 and Alert 360's customers.

101.    Through its deceptive sales practices and conduct, Vivint not only harms Alert 360 and its customers, it harms the entire industry by leading the consuming public to distrust home alarm providers—the very companies the established to instill a sense of security and trust in their customers.

102.    Because all of the state and federal regulatory actions and industry efforts have failed to curb Vivint's deceptive sales tactics, Alert 360 seeks an award of punitive damages in an amount that will make it financially unprofitable for Vivint to continue this conduct.

## VIVINT'S CONDUCT IS KNOWING AND INTENTIONAL

103.     Vivint's conduct is knowing and intentional.  At best, Vivint is aware of such conduct by its sales representatives but does not take sufficient actions to stop them despite having the ability to do so.  At worst, Vivint knowingly teaches and condones these actions by its sales representatives.

104.    Vivint's knowledge of its sales representatives' unlawful and deceitful conduct is evidenced by the geographically widespread and numerically voluminous nature of complaining Alert 360 customers.   Vivint is aware of the unlawful, deceitful, and deceptive practices and conduct of its sales representatives.  Vivint is further aware that the majority of the deceptive sales encounters of its sales representatives are never reported to Alert 360.  Alert 360 has received numerous reports of deceptive sales practices in most states in which Vivint sells alarm systems.

105.    Vivint's unlawful methods of competition are profitable. Vivint's narrative—that a few "bad apple" sales representatives, not the Corporation, are responsible for the unlawful conduct– stands in direct contrast to Vivint encouraging the deceptive sales practices among its sales persons, and even protecting its most profitable (and predatory) sales representatives.

106.    Vivint's "fine" policy illustrates the Company's illusory preventative measures. Occasionally, Vivint will "fine" salespeople for committing deceptive sales, but often that is only when a competitor, like Alert 360, gets involved and aids the customer in seeking resolution with Vivint.   On information and belief, these "fines" are often not actually collected from the representative, and sometimes they are merely deducted from a salesperson's incentive bonuses for meeting certain sales thresholds.  In other words, the fines are apparently paid from the very money the representative gains from using such deceptive sales practices in the first place.  It is profitable to the representative (and Vivint) because the salesperson gets "caught" on many fewer occasions than the conduct actually occurs.

107.    In any event, the "fines" levied are not sufficient to deter repetitive deceptive sales conduct by Vivint salespeople. Some of the worst offenders continue to be employed by Vivint, and some have been elevated into managerial positions.

108.    The FTC, while detailing Vivint's scheme of credit fraud, showed how Vivint actively protects its most egregious sales employees. *United States v. Vivint Smart Home, Inc.*, Case No. 2:21-cv-00267-TS, ¶20 (D. Utah Apr. 29, 2021).  As highlighted by the DOJ and FTC's lawsuit against Vivint, the company's unlawful conduct is knowing and intentional.

109.    In response to pressure from government regulators, Vivint fired some sales representatives in 2017.   However, Vivint turned around and rehired many of the same representatives. Vivint even allowed many of the "terminated" representatives to work at Vivint's sister company for a year, before allowing them to return to Vivint the following sales season.  The explanation for Vivint protecting its most egregious employees is obvious: deceptive conduct pays.  Vivint's most profitable sales representatives generated millions of dollars of revenue for the company, and Vivint's most profitable sales representatives are often the worst offenders.

110.    Vivint's actions underscore its overall approach to competition: profits come first.

111.    Vivint's unlawful conduct at the expense of Alert 360 has not stopped, and will not stop, because Vivint generates significant profits from its deceptive sales practices.  Vivint realizes profits in the millions of dollars based on the deceptive sales tactics of its sales force.  Every alarm account Vivint acquires through deceptive sales practices creates a new revenue stream for Vivint, potentially for several years beyond the initial term of the new contract and for substantially more value than the cost to Vivint in the cases where it "buys out" the customer's Alert 360 account.  Thus, Vivint's deceptive sales practices are designed to obtain as many accounts as possible through whatever means possible.  On information and belief, such conduct has permitted Vivint to bolster their financial reports and receive new credit and/or equity investments that otherwise might not be possible without the illegal sales conduct.  Such profits should be disgorged to the full extent permitted by the Lanham Act and related common law.

**ALERT 360 HAS INCURRED SIGNIFICANT DAMAGES RESULTING FROM VIVINT'S CONDUCT**

*Costs Incurred Repairing and/or Mitigating the Effects of Vivint's Deception*

112.   Vivint's deceptive sales tactics irreparably injure Alert 360's relationships with its existing customers.  As a result of Vivint's manipulation, Alert 360's customers allow Vivint's sales representatives entry to their homes under false pretenses, sign Vivint's contracts, uninstall their Alert 360 alarm systems, replace these systems with Vivint's own equipment, and terminate their Alert 360 contracts.

113.   Even where Alert 360's customers subsequently recognize the scam perpetrated by Vivint's sales representatives, Alert 360 has no option but to send technicians to the deceived customers' houses to reinstall, or even replace, the removed Alert 360 equipment at considerable expense to Alert 360.  Vivint is liable to Alert 360 for these costs and damages caused by Vivint's conduct.

114.   The constant need to proactively notify Alert 360 customers of Vivint's conduct—especially at the beginning of the summer sales season—as well as assist Alert 360 customers in fixing problems resulting from Vivint's deceptive sales conduct, imposes a substantial cost on Alert 360.  Because of Vivint's persistent deceptive sales practices, Alert 360 has to send out affirmative notifications to customers, hire, maintain, and train customer service agents, and otherwise allocate money, employees, and resources away from normal business operations to constantly police Vivint's salespeople.  Vivint is also liable for these costs and damages.

*Injury to Alert 360's Goodwill and Reputation*

115.   Vivint's deceptive sales tactics also injure Alert 360's goodwill and reputation. Depending on which false story Vivint communicated to any given customer, Alert 360's customers are left with the false belief that Alert 360 is out of business, that Alert 360 is in

bankruptcy, that Alert 360 has been acquired, that their Alert 360 alarm systems are outdated and vulnerable to burglars, or that Vivint has taken over Alert 360 accounts.  Others mistakenly believe that Vivint inappropriately gained access to the private data the customers had entrusted to Alert 360 (and in some instances convince customers to provide passwords and other alarm system credentials), leaving them to question Alert 360's ability to safeguard their interests, a critical shortcoming given the necessity of trust between any alarm services provider and its customers.

116.    In a broader sense, Vivint's actions damage Alert 360's goodwill and reputation as a reliable provider of security, automation and smart home services.  Vivint's targeting of Alert 360 customers has led some to cease all services with Alert 360 as a result of falling victim to these types of false and misleading practices.  Some wrongly blame Alert 360 for Vivint's conduct and never come to understand the lack of affiliation between Vivint and Alert 360.

117.    Even where Alert 360 customers understand Vivint's scams for what they are, Alert 360's goodwill and reputation is harmed, as some customers may reconsider their Alert 360 service because Alert 360 is a target of scammers.

118.    Customers often blame themselves for falling victim to Vivint's false and misleading sales tactics.  Such self-blame not only contributes to an under-reporting of deceptive sales conduct, but irreparably harms Alert 360's goodwill and reputation because customers believe they never would have fallen victim if they did not have an Alert 360 system in their home in the first place.

119.    Often in conjunction with, or as an alternative to the use of deceptive sales practices, Vivint also has begun a "buyout" program, which is itself rife with abuse and is contrary to common law prohibiting malicious/tortious interference with a contract.  On information and belief, Vivint often uses its "buyouts" to help appease customers after they have complained about

falling victim to Vivint deceptive sales practices.  Once the customer raises the fact they were defrauded and misled by Vivint's sales representative in one of the numerous ways described above, Vivint then offers to buy out the customer's Alert 360 contract as a way to "save" the sale. Vivint does so because it is profitable.  Vivint acquires the account through deceptive means, and if caught, pays a sum to the customer to pay off their Alert 360 contract that is far less than the new revenue stream Vivint will generate.  Vivint gains because the value of the account is many, if not most times, much more valuable than the amount required to pay off the Alert 360 account.

120.    Even when not connected to a deceptive sales practice, Vivint's buyout program is in itself illegal.  Vivint knows that the customer is in a contract with Alert 360, but nevertheless wrongfully interferes with such contractual relationship and induces the customer to breach their Alert 360 agreement. Alert 360 also seeks damages related to this conduct.

### *Misappropriation of Alert 360's Authorized Dealer Licensing*

121.    By falsely claiming an affiliation with Alert 360 in its sales to consumers, Vivint further injures Alert 360 by taking for itself the essential benefit of being an Alert 360 affiliate without paying any royalty or other consideration to Alert 360 for the claim of affiliation.  This is a benefit for which hundreds of licensed Alert 360 dealers pay substantial financial consideration to Alert 360.  Vivint pays nothing to use Alert 360's name and brand for its own benefit, despite others in this marketplace paying substantial sums for the rights provided through an official licensing relationship with Alert 360.  Moreover, Vivint does not abide by Alert 360's dealer guidelines and so misappropriates a right of affiliation with Alert 360.

### *Vivint's Deceptive Conduct Is Knowing and Intentional*

122.    Such practices violate statutory and common-law prohibitions against the use of false and deceptive statements in commerce.  They also violate the security system industry's own

Code of Ethics and Standards of Conduct, which requires that companies "truthfully and clearly identify themselves by name . . . at the initiation of a sales presentation, without request from the consumer," and which prohibits as common deceptive sales practices, inter alia, (a) any claim that a competitor is going out of business, (b) any claim that the company is taking over the competitor's accounts, or (c) any offer of an "update" or "upgrade" of an existing system that requires the execution of a contract with a new security services provider.

123.    Vivint knows these types of sales practices are contrary to the law and established industry standards, yet it knowingly continues such conduct.  Vivint has not taken appropriate action to curb such conduct by its sales representatives.  Some of the worst actors continue to be employed by Vivint despite numerous reports of deceptive conduct by those salespeople.  Vivint does not terminate or appropriately discipline such sales representatives because they bring substantial revenue streams to Vivint.  Instead, Vivint engages in window dressing: providing half-hearted discouragement of such practices at the initial onboarding of new salespeople and promulgating empty-shell written policies purportedly prohibiting the practices.  In reality, Vivint management condones and even teaches such deceptive sales tactics.   The individuals knowledgeable of how to successfully pull off deceptive sales practices are promoted in the sales force and then teach such tactics to new recruits as they are brought in each year. T he cycle repeats in contagious fashion.

## COUNT I - UNFAIR COMPETITION IN VIOLATION
## OF THE LANHAM ACT, 15 U.S.C. § 1125(a)

124.    Alert 360 incorporates paragraphs 1 through 123 as if set forth fully herein.

125.    Alert 360 Opco, Inc. owns the Alert 360 Trademarks. Central Security Group – Nationwide, Inc. d/b/a Alert 360 and Guardian Security Systems, Inc. d/b/a Alert 360 are wholly-owned subsidiaries of Alert 360 Opco, Inc. and as such utilize the Alert 360 Trademarks and name

with permission from Alert 360 Opco, Inc.  All three are injured by any effort of Vivint to confuse Alert 360's customers as to the affiliations of Vivint's sales representatives with Alert 360.

126.    Vivint's sales representatives use false representations of affiliation with Alert 360 to confuse Alert 360's customers as to the representatives' true affiliation, to interest the customers in their pitches, to win the customers' trust, and to gain access to the customers' homes.

127.    In fact, Vivint's sales representatives do not represent Alert 360, nor is Vivint affiliated in any manner with Alert 360.

128.    Vivint's sales representatives make these false representations to Alert 360's customers with the intent of deceiving Alert 360's customers as to a relationship or affiliation with Alert 360 that does not exist, and that has never existed.

129.    These false and misleading statements are likely to confuse consumers regarding Vivint's apparent (but false) affiliation with Alert 360 in the initial stages of a sale.

130.    Some Alert 360 customers, initially confused at their doorsteps, eventually realize by the end of the sale that the sales representatives represent Vivint, not Alert 360.  But many do not, and remain confused at the point of sale and sign contracts with Vivint in the mistaken belief that they are dealing with Alert 360 or one of its affiliates.  Even when the customer is initially confused but later comes to understand the sales representative is not affiliated with Alert 360, Alert 360 is still damaged by Vivint's freeriding on Alert 360's name and brand recognition.

131.    Alert 360 has been and will continue to be damaged as a result of Vivint's false representations by the confusion of the market for Alert 360's goods and services, by the disruption of Alert 360's relationships with its customers, by the diversion of Alert 360's customers to Vivint, by Alert 360's lost royalties, by Alert 360's loss of control of the use of its brand in the market, by

the reallocation of employees, money and resources combatting Vivint's deceptive conduct, and by damage to Alert 360's goodwill and reputation as a reliable provider of security systems.

132.    Alert 360 is entitled to an injunction pursuant to 15 U.S.C. §1116(a) barring Vivint from further violations of 15 U.S.C. §1125(a).   Given Vivint's disregard of its sales representatives' false sales pitches, and its disregard of state and federal regulatory enforcement efforts, it is likely that Vivint will continue to engage in such practices unless it is enjoined by this Court from further violations.

133.    Alert 360 is entitled to an award of compensatory damages, as well as Vivint's profits, Alert 360's attorney fees, and the costs of this action pursuant to 15 U.S.C. § 1117(a).  The court, pursuant the discretion confided to it under this section of the Act, should also consider enhancing these damages to compensate Alert 360 fully for its losses.

134.    WHEREFORE, Alert 360 respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

a)    An order, pursuant to 15 U.S.C. §1116(a) permanently restraining and enjoining Vivint and its agents, servants, independent contractors, subsidiaries, affiliates, employees, officers, attorneys, successors and assigns, from falsely stating or representing, or training sales representatives to state or represent that:

1.   Their agents are visiting from "the alarm company" or "the security company" without also specifying Vivint's name in the same sentence;

2.   Alert 360 is going out of business or is in financial difficulty;

3.   Alert 360 does not exist;

4.   Alert 360 is changing or has changed its company name;

5. Vivint has acquired, has merged with, has been taken over by, or is part of Alert 360;

6. Vivint is acting on behalf of, or is otherwise acting with the consent or approval of Alert 360;

7. Vivint is the "sister" company of Alert 360;

8. Vivint manufactures the equipment used by Alert 360, or that Vivint represents or is visiting on behalf of an alarm equipment manufacturer;

9. Vivint is performing routine maintenance on the customer's Alert 360 equipment;

10. Any change proposed during a sales solicitation is an "upgrade" or upgrade of the customer's existing alarm system or alarm monitoring service agreement with Alert 360;

11. An Alert 360 customer's Alert 360 security system is outdated or deficient;

12. An enjoined party is taking over the monitoring of an Alert 360 account or has purchased an Alert 360 account from Alert 360;

13. Alert 360 is not or has stopped monitoring the alarm system for that person, residence, or business;

14. Alert 360 will no longer be able to monitor or service the alarm system for that person, residence, or business;

15. Any enjoined party is affiliated with, has the endorsement of, or is any manner acting at the direction of any governmental or law enforcement

agency without the prior approval of such governmental or law enforcement agency; or

16. Any other false or misleading representation to current or former customers of Alert 360 in the marketing, sale, or service of an alarm system that Vivint's sales representative knows to be false when made.

b) Compensatory damages, in an amount to be established at trial, but believed to be in excess of $10 Million;

c) An accounting of Vivint's profits resulting from its deceptive practices, and payment of such profits to Alert 360;

d) Attorneys' fees, costs, pre-judgment interest, and post judgment interest incurred in the prosecution of this action, as provided by 15 U.S.C. § 1117(a); and

e) Such other and further relief as the Court may deem appropriate in the circumstances.

## **COUNT II – COMMON LAW TRADEMARK INFRINGEMENT**

135.   Alert 360 incorporates paragraphs 1 through 134 as if set forth fully herein.

136.   Alert 360 Opco, Inc. owns the Alert 360 Trademarks.  Central Security Group – Nationwide, Inc. d/b/a Alert 360 and Guardian Security Systems, Inc. d/b/a Alert 360 are wholly-owned subsidiaries of Alert 360 Opco, Inc. and as such utilize the Alert 360 Trademarks and name with permission from Alert 360 Opco, Inc.  All three are injured by any effort of Vivint to confuse Alert 360's customers as to the affiliations of Vivint's sales representatives with Alert 360.

137.   Vivint's sales representatives use false representations of affiliation with Alert 360 to confuse Alert 360's customers as to the representatives' true affiliation, to interest the customers in their pitches, to win the customers' trust, and to gain access to their homes.

138.    Vivint's sales representatives do not represent Alert 360, nor is Vivint affiliated in any manner with Alert 360.

139.    Vivint's sales representatives make these false representations to Alert 360's customers with the intent of deceiving Alert 360's customers as to a relationship or affiliation with Alert 360 that does not exist, and that has never existed.

140.    These false and misleading statements are likely to confuse consumers regarding Vivint's apparent (but false) affiliation with Alert 360 in the initial stages of a sale.

141.    Alert 360 customers have been and continue to be actually confused regarding Vivint's affiliation with Alert 360.

142.    Alert 360 has been and will continue to be damaged as a result of Vivint's false representations by the confusion of the market for Alert 360's goods and services, by the disruption of Alert 360's relationships with its customers, by the diversion of Alert 360's customers to Vivint, by Alert 360's lost royalties, by Alert 360's loss of control of the use of its brand in the market, by the reallocation of employees, money and resources combatting Vivint's deceptive conduct, and by damage to Alert 360's goodwill and reputation as a reliable provider of security systems.

143.    WHEREFORE, Alert 360 respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

a)  An order permanently restraining and enjoining Vivint and its agents, servants, independent contractors, subsidiaries, affiliates, employees, officers, attorneys, successors and assigns, from falsely stating or representing, or training sales representatives to state or represent that:

   1.  Their agents are visiting from "the alarm company" or "the security company" without also specifying Vivint's name in the same sentence;

2. Alert 360 is going out of business or is in financial difficulty;

3. Alert 360 does not exist;

4. Alert 360 is changing or has changed its company name;

5. Vivint has acquired, has merged with, has been taken over by, or is part of Alert 360;

6. Vivint is acting on behalf of, or is otherwise acting with the consent or approval of Alert 360;

7. Vivint is the "sister" company of Alert 360;

8. Vivint manufactures the equipment used by Alert 360, or that Vivint represents or is visiting on behalf of an alarm equipment manufacturer;

9. Vivint is performing routine maintenance on the customer's Alert 360 equipment;

10. Any change proposed during a sales solicitation is an "upgrade" or upgrade of the customer's existing alarm system or alarm monitoring service agreement with Alert 360;

11. An Alert 360 customer's Alert 360 security system is outdated or deficient;

12. An enjoined party is taking over the monitoring of an Alert 360 account or has purchased an Alert 360 account from Alert 360;

13. Alert 360 is not or has stopped monitoring the alarm system for that person, residence, or business;

14. Alert 360 will no longer be able to monitor or service the alarm system for that person, residence, or business;

15. Any enjoined party is affiliated with, has the endorsement of, or is any manner acting at the direction of any governmental or law enforcement agency without the prior approval of such governmental or law enforcement agency; or

16. Any other false or misleading representation to current or former customers of Alert 360 in the marketing, sale, or service of an alarm system that Vivint's sales representative knows to be false when made.

b) Compensatory damages, in an amount to be established at trial, but believed to be in excess of $10 Million;

c) Punitive damages in a sum sufficient to deter Vivint from engaging in further deceptive sales practices;

d) Attorneys' fees, costs, pre-judgment interest, and post judgment interest incurred in the prosecution of this action; and

e) Such other and further relief as the Court may deem appropriate in the circumstances.

## <u>COUNT III – COMMON LAW UNFAIR COMPETITION</u>

144. Alert 360 incorporates Paragraphs 1 through 143, as if set forth fully here.

145. Alert 360 and Vivint compete for a common pool of customers.  Alert 360 and Vivint market alarm services to the same target market of residential customers.

146. Vivint's use of false sales pitches have confused and continue to confuse Alert 360 customers as to Vivint's affiliation.

147.    Vivint's use of false sales pitches that confuse customers as to Vivint's affiliation, and as to the source of their services, has caused Alert 360 customers to cancel their Alert 360 alarm services under false pretenses, and therefore causing damage to Alert 360.

148.    Vivint's sales representatives' false sales pitches at customer doorsteps are knowing, willful, and in reckless disregard for the rights of others.  Accordingly, the Court should award punitive damages in an amount sufficient to deter Vivint from continuing to engage in unfair competition in the market for electronic security services through their sales representatives.

149.    Alert 360 is entitled to injunctive relief pursuant to common law for Vivint's ongoing deceptive marketing activities.  Given the ongoing nature of Vivint's misconduct, Vivint is likely to continue to engage in such practices unless this Court takes appropriate measures to enjoin further violations.

150.    WHEREFORE, Alert 360 respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

a)   An order permanently restraining and enjoining Vivint and its agents, servants, independent contractors, subsidiaries, affiliates, employees, officers, attorneys, successors and assigns, from falsely stating or representing, or training sales representatives to state or represent that:

1.   Their agents are visiting from "the alarm company" or "the security company" without also specifying Vivint's name in the same sentence;

2.   Alert 360 is going out of business or is in financial difficulty;

3.   Alert 360 does not exist;

4.   Alert 360 is changing or has changed its company name;

5. Vivint has acquired, has merged with, has been taken over by, or is part of Alert 360;

6. Vivint is acting on behalf of, or is otherwise acting with the consent or approval of Alert 360;

7. Vivint is the "sister" company of Alert 360;

8. Vivint manufactures the equipment used by Alert 360, or that Vivint represents or is visiting on behalf of an alarm equipment manufacturer;

9. Vivint is performing routine maintenance on the customer's Alert 360 equipment;

10. Any change proposed during a sales solicitation is an "upgrade" or upgrade of the customer's existing alarm system or alarm monitoring service agreement with Alert 360;

11. An Alert 360 customer's Alert 360 security system is outdated or deficient;

12. An enjoined party is taking over the monitoring of an Alert 360 account or has purchased an Alert 360 account from Alert 360;

13. Alert 360 is not, or has stopped, monitoring the alarm system for that person, residence, or business;

14. Alert 360 will no longer be able to monitor or service the alarm system for that person, residence, or business;

15. Any enjoined party is affiliated with, has the endorsement of, or is any manner acting at the direction of any governmental or law enforcement

agency without the prior approval of such governmental or law enforcement agency; or

16. Any other false or misleading representation to current or former customers of Alert 360 in the marketing, sale, or service of an alarm system that Vivint's sales representative knows to be false when made.

b) Compensatory damages, in an amount to be established at trial, but believed to be in excess of $10 Million;

c) Punitive damages in a sum sufficient to deter Vivint from engaging in further deceptive sales practices;

d) Attorneys' fees, costs, pre-judgment interest, and post judgment interest incurred in the prosecution of this action; and

151.    Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT IV – VIOLATION OF THE OKLAHOMA DECEPTIVE TRADE PRACTICES ACT, 78 OKLA. STAT. § 54(A)

152.    Alert 360 incorporates Paragraphs 1 through 151, as if set forth fully here.

153.    Alert 360 and Vivint compete for a common pool of customers. Alert 360 and Vivint market alarm services to the same target market of residential customers.

154.    Vivint's use of false and deceptive sales pitches have confused and continue to confuse Alert 360 customers as to Vivint's affiliation.

155.    Vivint's use of false and deceptive sales pitches that confuse customers as to Vivint's affiliation, and as to the source of their services, has caused Alert 360 customers to cancel their Alert 360 alarm services under false pretenses, therefore causing damage to Alert 360.  Alert 360 is entitled to recover damages under 78 Okla. Stat. § 54(A).

156.     Vivint's sales representatives' false sales pitches at customer doorsteps are knowing, willful, and in reckless disregard for the rights of others.  Accordingly, the Court should award punitive damages in an amount sufficient to deter Vivint from continuing to engage in unfair competition in the market for electronic security services through their sales representatives.

157.     Vivint is entitled to injunctive relief for Vivint's ongoing marketing activities. Given the ongoing nature of Vivint's misconduct, Vivint is likely to continue to engage in such practices unless this Court takes appropriate measures to enjoin further violations.

158.     WHEREFORE, Alert 360 respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief pursuant to 78 Okla. Stat. § 54(A):

a)   An order permanently restraining and enjoining Vivint and its agents, servants, independent contractors, subsidiaries, affiliates, employees, officers, attorneys, successors and assigns, from falsely stating or representing, or training sales representatives to state or represent that:

1.   Their agents are visiting from "the alarm company" or "the security company" without also specifying Vivint's name in the same sentence;

2.   Alert 360 is going out of business or is in financial difficulty;

3.   Alert 360 does not exist;

4.   Alert 360 is changing or has changed its company name;

5.   Vivint has acquired, has merged with, has been taken over by, or is part of Alert 360;

6.   Vivint is acting on behalf of, or is otherwise acting with the consent or approval of Alert 360;

7.   Vivint is the "sister" company of Alert 360;

8. Vivint manufactures the equipment used by Alert 360, or that Vivint represents or is visiting on behalf of an alarm equipment manufacturer;

9. Vivint is performing routine maintenance on the customer's Alert 360 equipment;

10. Any change proposed during a sales solicitation is an "upgrade" or upgrade of the customer's existing alarm system or alarm monitoring service agreement with Alert 360;

11. An Alert 360 customer's Alert 360 security system is outdated or deficient;

12. An enjoined party is taking over the monitoring of an Alert 360 account or has purchased an Alert 360 account from Alert 360;

13. Alert 360 is not, or has stopped, monitoring the alarm system for that person, residence, or business;

14. Alert 360 will no longer be able to monitor or service the alarm system for that person, residence, or business;

15. Any enjoined party is affiliated with, has the endorsement of, or is any manner acting at the direction of any governmental or law enforcement agency without the prior approval of such governmental or law enforcement agency; or

16. Any other false or misleading representation to current or former customers of Alert 360 in the marketing, sale, or service of an alarm system that Vivint's sales representative knows to be false when made.

b)     Compensatory damages, in an amount to be established at trial, but believed to be in excess of $10 Million;

c)     Punitive damages in a sum sufficient to deter Vivint from engaging in further deceptive sales practices;

d)     Attorneys' fees, costs, pre-judgment interest, and post judgment interest incurred in the prosecution of this action; and

159.    Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT IV – COMMON LAW MALICIOUS/TORTIOUS INTERFERENCE WITH A CONTRACT

160.    Alert 360 incorporates Paragraphs 1 through 159 as if set forth fully herein.

161.    Alert 360 maintains valid and enforceable contracts and business relationships with its customers.

162.    Typically, Alert 360 customers display an Alert 360 sign or window sticker outside their homes to deter potential burglars and broadcast to the outside world that the home is protected by an Alert 360 alarm system.

163.    Vivint is aware of the contractual and business relationship between Alert 360 and its customers. When Vivint's sales representatives visit the homes of these individuals, they become (or are already) aware of such relationship and contract by, among other means: the sign displayed in front of the customer's home, talking with the customer, observing the Alert 360 equipment in the customer's home, or through prior research and intelligence conducted on the customer's address regarding existing alarm systems.

164.    Despite knowledge of the customer's contractual and business relationship with Alert 360, Vivint sales representatives intentionally; maliciously; and without valid justification,

excuse, or privilege interfere with such relationship using improper means, to wit, misleading Alert 360's customers into believing that Vivint represents Alert 360, that Vivint is affiliated with Alert 360, that they are visiting at Alert 360's direction, that they work for the companies that made the Alert 360 alarm equipment installed in the customers' homes, or that Alert 360 has otherwise blessed Vivint to work on Alert 360's behalf.  Once Vivint's representatives induce Alert 360 customers to believe that they have an existing business relationship with Alert 360, Vivint's representatives lead customers to sign Vivint contracts and install Vivint alarm systems, misleading Alert 360 customers to believe that they are receiving new Alert 360 equipment from Alert 360, an Alert 360 affiliate, or an Alert 360 successor, that Vivint is assuming the Alert 360 account, or that the customer has no choice but to permit the transaction to go forward if he or she wishes to continue to have operational alarm-monitoring services.  Further, Vivint representatives procure the breach of the Alert 360 contract upon the promise that Vivint will "buy out" the remaining term by paying to the customer an amount equal to the remaining obligation on their Alert 360 contract.

165.    Vivint also offers buyouts to "save" sales procured through deceptive sales conduct in an attempt to pacify the customer.

166.    In other instances, Vivint sales representatives misrepresent to Alert 360 customers that the customer is obtaining third-party credit financing the facilitate a sale that the customer otherwise would not have any interest in.  The misrepresentations, as outlined in the DOJ action, wrongfully interfere with Alert 360's contracts with customers.

167.    The customer does not always remit such payment to Alert 360.  Even when the customer does, Alert 360 is damaged because the value of the customer's future account revenue often exceeds the contractual value of the remaining contractual term.  For example, absent

Vivint's improper interference, it is not uncommon for a customer with two years left on his or her Alert 360 contract to remain a loyal and paying customer to Alert 360 for many years beyond the remaining two-year term.  This is also why Vivint wrongfully engages in such buyout practices: Vivint knows the value of an alarm account often exceeds the immediate value under the contract.

168.    Vivint's intentional, malicious, and unjustifiable interferences with Alert 360's business relationships have caused Alert 360 to suffer irreparable harm and damages in the form of lost goodwill and lost profits.  Alert 360 is also damaged by Vivint's unlawful conduct by losing revenue streams that otherwise would remain with Alert 360 absent Vivint's "buy out" offer, and because the customer does not always remit any remaining amounts due and owing to Alert 360.

WHEREFORE, Alert 360 respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

a.   Compensatory damages, in an amount to be established at trial;

b.   Punitive damages in a sum sufficient to deter Vivint from engaging in further deceptive sales tactics;

c.   Attorneys' fees, costs, pre-judgment interest, and post judgment interest incurred in the prosecution of this action; and

d.   Such other and further relief as the Court may deem appropriate in the circumstances.

## JURY DEMAND

Alert 360 demands a trial by jury on all issues so triable.

Dated:  March 1, 2023.                    Respectfully submitted,

                                          **CHRISTENSEN LAW GROUP, P.L.L.C.**

                                          /s/ J. Clay Christensen
                                          J. Clay Christensen (OBA #11789)
                                          Jonathan M. Miles (OBA #31152)
                                          The Parkway Building
                                          3401 N.W. 63rd Street, Suite 600
                                          Oklahoma City, Oklahoma 73116
                                          Tel: (405) 232-2020
                                          Fax: (405) 228-1113
                                          Clay@christensenlawgroup.com
                                          Jon@christensenlawgroup.com

                                          **SHOOK, HARDY & BACON L.L.P.**

                                          By: /s/  Charles C. Eblen
                                          Charles C. Eblen (*pro hac vice forthcoming*)
                                          Jason Scott (*pro hac vice forthcoming*)
                                          2555 Grand Blvd.
                                          Kansas City, Missouri 64108
                                          Tel: (816) 474-6550
                                          Fax: (816) 421-5547
                                          ceblen@shb.com
                                          jscott@shb.com

                                          -and-

                                          Eric J. Hobbs (*pro hac vice forthcoming*)
                                          1660 17th Street, Suite 450
                                          Denver, Colorado 80202
                                          Tel: (303) 285-5300
                                          Fax: (303) 285-5301
                                          ehobbs@shb.com

                                          -and-

                                          Caroline M. Gieser (*pro hac vice forthcoming*)
                                          1230 Peachtree Street
                                          Suite 1200
                                          Atlanta, Georgia 30317
                                          Tel: (470) 867-6013
                                          Fax: (470) 867-6001
                                          cgieser@shb.com

*Counsel for Plaintiffs, Alert 360 Opco, Inc., Central Security Group – Nationwide, Inc. d/b/a Alert 360 and Guardian Security Systems, Inc. d/b/a Alert 360*

## CERTIFICATE OF SERVICE

I, <u>J. Clay Christensen</u>, an attorney, hereby certify that on **March 1, 2023**, I caused a true and complete copy of the foregoing **Complaint** to be electronically filed with the Clerk via the Pacer e-filing system.

<u>  /s/   J. Clay Christensen         </u>
*Attorney for Counsel for Plaintiffs, Alert 360 Opco, Inc., Central Security Group – Nationwide, Inc. d/b/a Alert 360 and Guardian Security Systems, Inc. d/b/a Alert 360*